UNITED STATES, Appellee

v

HENRY H. HOWE, JR., Second Lieutenant,
U. S. Army, Appellant

17 USCMA 165, 37 CMR 429

No. 19,846

August 4, 1967

*Mrs. Eleanor H. Norton* and *Captain Kenneth J. Stuart* argued the cause for Appellant, Accused.

*Captain Maurice Jay Kutner* argued the cause for Appellee, United States. With him on the brief were *Colonel Peter S. Wondolowski, Lieutenant Colonel David Rarick,* and *Captain Anthony L. Tersigni.*

## Opinion of the Court

KILDAY, Judge:

Petitioner was arraigned before a general court-martial convened by the Commanding General, United States Army Air Defense Center at Fort Bliss, Texas. He was charged with using contemptuous words against the President of the United States and conduct unbecoming an officer and a gentleman, in violation of Articles 88 and 133, Uniform Code of Military Justice, 10 USC §§ 888 and 933, respectively. He was also charged, originally, with public use of language disloyal to the United States with design to promote disloyalty and disaffection among the troops and civilian populace, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. As to this last charge, the defense motion to dismiss was sustained by the law officer. He was convicted of the two charges, first above-mentioned, and sentenced to dismissal, total forfeitures, and confinement at hard labor for two years. The convening authority reduced the period of confinement to one year and otherwise approved the sentence.[1] A board of review in the office of the Judge Advocate General of the Army affirmed the findings and sentence.

In due time, petitioner filed with this Court, pursuant to Article 67(b)(3), Uniform Code of Military Justice, 10 USC § 867, a petition for review. Upon consideration of that petition by this Court, the same was denied. Thereupon, petitioner filed with this Court his petition for reconsideration. This Court, by order, directed that the petition for reconsideration be set for oral argument and that briefs be filed by counsel for both parties. Briefs having been filed and oral argument held, we proceed to the disposition of the petition for reconsideration.

The specification under the charge of violation of Article 88, supra, reads as follows:

---

[1] Three months and two days after his trial he was released from confinement under commandant's parole.

"In that Second Lieutenant Henry H. Howe, Junior, U. S Army, Headquarters Company, 31st Engineer Battalion, Fort Bliss, Texas, did, in the vicinity of San Jacinto Plaza, El Paso, Texas, on or about 6 November 1965, wrongfully and publicly use contemptuous words against the President of the United States, Lyndon B. Johnson, by carrying and displaying to the public a sign reading as follows, to wit: 'LET'S HAVE MORE THAN A CHOICE BETWEEN PETTY IGNORANT FACISTS IN 1968' and on the other side of the sign the words 'END JOHNSON'S FACIST AGRESSION IN VIET NAM,' or words to that effect."

The specification under the charge of violation of Article 133, supra, reads as follows:

"In that Second Lieutenant Henry H. Howe, Junior, U. S. Army, Headquarters Company, 31st Engineer Battalion, Fort Bliss, Texas, did in the vicinity of San Jacinto Plaza, El Paso, Texas, on or about 6 November 1965, wrongfully take part in a public demonstration by carrying and displaying to the public a sign reading as follows, to wit: 'LET'S HAVE MORE THAN A CHOICE BETWEEN PETTY IGNORANT FACISTS IN 1968' and on the other side the words 'END JOHNSON'S FACIST AGRESSION IN VIET .NAM,' or words to that effect, his acts constituting conduct unbecoming an officer and gentleman in the United States Army."

Petitioner presents that the record reveals that a group of professors and students from a state college at El Paso, Texas, intending to "demonstrate against American policy," requested permission from the City Council of that city to hold a sidewalk demonstration in San Jacinto Plaza, but that the council initially denied permission. Thereafter, "pressure" was brought on the City Council which persuaded its members that there was a constitutional right to demonstrate. The City Attorney then advised the council that under the Constitution no permission was necessary for a group to hold a sidewalk demonstration.

Petitioner also points out that one of the professors of the above-mentioned group testified that the major purpose of the demonstration was to publicize "the other position in Vietnam," but after the City Council denied permission to demonstrate, the rights guaranteed under the First and Fourteenth Amendments became a "second point" of the demonstration.

We note that the record of trial reveals that the proposal to demonstrate had been a source of controversy for two weeks preceding the demonstration held on November 6, 1965. This controversy had, during that period, consumed much space in the local press and in broadcasts on local radio and television stations. At the time and place set for the demonstration, a crowd of some 2,000 persons had assembled and the picket line was met with pro-Vietnam sentiment, including spectators with "Win in Vietnam" stickers pasted on their foreheads, and American Legionnaires, distinctively attired, passing out small United States flags. There was a counter-demonstration, and "cat calls and comments" were aimed at the demonstrators by spectators but otherwise the demonstration was peaceful.

The Assistant Chief of Police of El Paso testified that at the time of the demonstration he was a police captain in charge of the area of demonstration and had a force of thirty-three policemen stationed in the immediate vicinity of the park, with a reserve force one block away to preclude any violence which might occur or could occur. It also appears from the record that military policemen from the Provost Marshal's Office, Fort Bliss, Texas, were at the scene to aid the civilian police concerning any military personnel in uniform that might be involved in the demonstration by returning them to Fort Bliss.

The record further reveals that some twelve demonstrators walked in line about the park carrying signs reading, "let's get our boys out of Viet Nam," "get out of Viet Nam," "peace in Viet Nam," and "would Jesus carry a draft card." The demonstraction was photographed and recorded on

168

film by the El Paso Police Department and these photographs were admitted in evidence and the film projected for the court-martial. The demonstration was recorded on motion picture film by at least two of the local television stations and the same were broadcast by those stations.

The petitioner is a graduate of the University of Colorado where he majored in political science. While a student, he voluntarily participated in the Reserve Officers' Training Corps, and upon graduation he accepted a commission as a second lieutenant in the United States Army Reserve. He was ordered to active duty under that commission and had been on duty approximately twelve months at the time of this occurrence.

Petitioner was not a member of the group of professors and students which arranged for, and organized, the demonstration in San Jacinto Plaza. It appears as if he was not known to the members of that group. Prior to their assembly, he was observed at the site of the demonstration holding in his hand a rolled piece of cardboard. As the group began to march in its picket line, he joined the same at the rear thereof, unrolled the cardboard which he carried and held it before him as he walked, reversing the same from time to time so that each side was visible to the assembled crowd. On one side the placard contained the lettering: "LET'S HAVE MORE THAN A 'CHOICE' BETWEEN PETTY, IGNORANT, FACISTS in 1968"; and on the other side the lettering: "END JOHNSON'S FACIST AGRESSION IN VIETNAM."

One of the military policemen present testified he recognized three or four other servicemen at the scene. There is no means of knowing the number of other servicemen who may have been present, not in uniform, and not identified by the witness; nor the number of servicemen who may have seen the petitioner marching, on the films broadcast by the television stations.

In his initial petition for review, petitioner assigned the following as errors:

1. The charges against appellant violate the First Amendment to the Constitution.

2. Articles 88 and 133 are so vague and uncertain that they violate the Due Process clause of the Fifth Amendment.

3. The charge under Article 133 fails to state an offense.

4. The law officer erred to the substantial prejudice of the appellant in failing to instruct, *sua sponte,* that if the court-martial found the allegedly contemptuous words to have been uttered in the course of a political discussion, then it had to find that appellant intended them to be personally disrespectful.

5. Appellant was substantially prejudiced by the law officer's ruling that the maximum sentence for the charged offenses included confinement at hard labor for three years.

6. The law officer erred to the substantial prejudice of the appellant by instructing the court-martial, over defense objection, that in determining whether the words uttered by appellant were contemptuous of the President the court-martial "should apply the test of how the words were understood and what they were taken to mean by the persons who saw them, or some of them."

7. The appellant was prejudiced in his appeal before the board of review by Lieutenant Colonel Jacob Hagopian's participation in the oral argument and decision of the instant case.

Article 88, Uniform Code of Military Justice, 10 USC § 888, reads as follows:

"Any commissioned officer who uses contemptuous words against the President, the Vice President, Congress, the Secretary of Defense, the Secretary of a military department, the Secretary of the Treasury, or the Governor or legislature of any State, Territory, Commonwealth,

**169**

or possession in which he is on duty or present shall be punished as a court-martial may direct."

The petitioner contends that this Article and the charge laid under it violate the Bill of Rights and the First Amendment thereof.

We note that this provision was not new to military law when it was adopted as a part of the Uniform Code of Military Justice. Actually, this provision, and its precursors, are older than the Bill of Rights, older than the Constitution, and older than the Republic itself.

The British Articles of War of 1765, in force at the beginning of our Revolutionary War, provided for the court-martial of any officer or soldier who presumed to use traitorous or disrespectful words against "the Sacred Person of his Majesty, or any of the Royal Family"; and of any officer or soldier who should "behave himself with Contempt or Disrespect towards the General, or other Commander in Chief of Our Forces, or shall speak Words tending to his Hurt or Dishonour."[2]

The Articles of War adopted by the Continental Congress on June 30, 1775, revised the British language to adjust the same to the new concept of "Continental Forces" and made punishable by court-martial the act of any officer or soldier who behaved himself with "contempt or disrespect toward the general or generals, or commanders in chief of the continental forces, or shall speak false words, tending to his or their hurt or dishonor."[3]

The Declaration of Independence, having been signed, the Articles of Confederation and Perpetual Union, having been reported to the Continental Congress,[4] and the confederacy known as "The United States of America," having begun to emerge with the major authority residing in the "United States of America, in Congress assembled," the Continental Congress, on September 20, 1776, adopted new Articles of War making punishable by court-martial the conduct of any officer or soldier who "presume to use traiterous or disrespectful words against the authority of the United States in Congress assembled, or the legislature of any of the United States in which he may be quartered"; and of any officer or soldier, "who shall behave himself with contempt or disrespect towards the general, or other commander-in-chief of the forces of

---

[2] The British Articles of War of 1765, section II, provided:

"ART. I.

"Whatsoever Officer or Soldier shall presume to use traiterous or disrespectful Words against the Sacred Person of his Majesty, or any of the Royal Family; if a Commissioned Officer, he shall be cashiered; if a Non-commissioned Officer or Soldier, he shall suffer such Punishment as shall be inflicted upon him by the Sentence of a Court-martial.

"ART. II.

"Any Officer or Soldier who shall behave himself with Contempt or Disrespect towards the General, or other Commander in Chief of Our Forces, or shall speak Words tending to his Hurt or Dishonour, shall be punished according to the Nature of his Offence, by the Judgment of a Court-martial." [Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, at page 932.]

[3] The Articles of War adopted by the Continental Congress on June 30, 1775, contained the following provision:

"IV. Any officer or soldier, who shall behave himself with contempt or disrespect towards the general or generals, or commanders in chief of the continental forces, or shall speak false words, tending to his or their hurt or dishonor, shall be punished according to the nature of his offence, by the judgment of a general court-martial." [Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, at pages 953–954.]

[4] The Articles of Confederation, by their terms, required approval of all the States. Maryland did not approve until March 1, 1781; therefore, the new nation acted practically throughout the Revolutionary War by general agreement only.

170

the United States, or shall speak words tending to his hurt or dishonor."[5]

The first session of the First Congress adopted a temporary provision, to remain in effect until the end of the next session of Congress, expressly extending the rules and Articles of War which had been enacted by the United States in Congress assembled. The second session of the First Congress adopted permanent legislation expressly extending those rules and Articles of War.[6]

On December 15, 1791, the President advised the Congress that the required three-fourths of the States had ratified the amendments constituting the Bill of Rights. Thereafter, and on April 10, 1806, the Congress enacted new Articles of War and included therein the following provision:

"ART. 5. Any officer or soldier who shall use contemptuous or disrespectful words against the President of the United States, against the Vice-President thereof, against the Congress of the United States, or against the Chief Magistrate or Legislature of any of the United States, in which he may be quartered, if a commissioned officer, shall be cashiered, or otherwise punished, as a court-martial shall direct; if a noncommissioned officer or soldier, he shall suffer such punishment as shall be inflicted on him by the sentence of a court-martial." [Act of April 10, 1806, 2 Stat 359, 360. Text included in Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, at page 976.]

With some change in language, the last quoted article of the Articles of War of 1806 was reenacted in the Articles of War adopted by the Congress on June 22, 1874.[7] On August 29, 1916,[8] and again in 1920,[9] substantially the same provision was reenacted

---

[5] The Articles of War adopted by the Continental Congress on September 20, 1776, contained the following provisions:

"Section II.

"*Art. 1.* Whatsoever officer or soldier shall presume to use traiterous or disrespectful words against the authority of the United States in Congress assembled, or the legislature of any of the United States in which he may be quartered, if a commissioned officer, he shall be cashiered; if a non-commissioned officer or soldier, he shall suffer such punishment as shall be inflicted upon him by the sentence of a court-martial.

"*Art. 2.* Any officer or soldier who shall behave himself with contempt or disrespect towards the general, or other commander-in-chief of the forces of the United States, or shall speak words tending to his hurt or dishonor, shall be punished according to the nature of his offence, by the judgment of a court-martial." [Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, at page 961.]

[6] Act of September 29, 1789, section 4, First Congress, Session I, 1 Stat 95; Act of April 30, 1790, section 13, First Congress, Session II, 1 Stat 119, 121.

[7] The Articles of War adopted by Congress on June 22, 1874, contained the following provision:

"ART. 19.—Any officer who uses contemptuous or disrespectful words against the President, the Vice-President, the Congress of the United States, or the chief magistrate or legislature of any of the United States in which he is quartered, shall be dismissed from the service, or otherwise punished, as a court-martial may direct. Any soldier who so offends shall be punished as a court-martial may direct." [Revised Statutes, section 1342, Article 19 (1874). Text included in Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 987.]

[8] The Articles of War adopted by Congress on August 29, 1916, contained the following provision:

" 'ART. 62. DISRESPECT TOWARD THE PRESIDENT, VICE PRESIDENT, CONGRESS, SECRETARY OF WAR, GOVERNORS, LEGISLATURES.—Any officer who uses contemptuous or disrespectful words against the President, Vice President, the Congress of the United States, the Secretary of War, or the governor or legislature of any State, Territory, or other possession of the United States in which he is quartered shall be dismissed from the

by the Congress. It was not changed in 1948 by the Elston Act, which revised the Articles of War after the termination of World War II.[10] And, finally, it was reenacted as Article 88 of the Uniform Code of Military Justice, supra. Act of May 5, 1950, 64 Stat 107, 135; Act of August 10, 1956, 70A Stat 36, 67. Now, however, it applies to officers only; that portion of previous Articles relating to "other persons subject to military law" having been deleted.

The First Amendment to the Constitution of the United States provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Of it, the Supreme Court has said:

"At the outset we reject the view that freedom of speech and association . . . as protected by the First and Fourteenth Amendments, are 'absolutes,' not only in the undoubted sense that where the constitutional protection exists it must prevail, but also in the sense that the scope of that protection must be gathered solely from a literal reading of the First Amendment." [Konigsberg v State Bar of California, 366 US 36, 49, 6 L ed 2d 105, 116, 81 S Ct 997 (1961).]

". . . We venture to believe that neither Hamilton nor Madison, nor any other competent person then or later, ever supposed that to make criminal the counseling of a murder within the jurisdiction of Congress would be an unconstitutional interference with free speech." [Justice Holmes in Frohwerk v United States, 249 US 204, 63 L ed 561, 564, 39 S Ct 249 (1919).]

". . . But the character of every act depends upon the circumstances in which it is done. Aikens v Wisconsin, 195 US 194, 205, 206, 49 L ed 154, 159, 160, 25 Sup Ct Rep 3. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre, and causing a panic. . . . The question in every case is whether the words used are used in such circumstances and are not such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree." [Justice Holmes in Schenck v United States, 249 US 47, 63 L ed 470, 473–474, 39 S Ct 247 (1919).]

". . . Speech is not an absolute, above and beyond control of the legislature when its judgment, subject to review here, is that certain kinds of speech are so undesirable as to warrant criminal sanction. Nothing is more certain in modern society than the principle that there are no absolutes, that a name, a

---

service or suffer such other punishment as a court-martial may direct. Any other person subject to military law who so offends shall be punished as a court-martial may direct.'" [Act of August 29, 1916, 39 Stat 619, 660; Manual for Courts-Martial, U. S. Army, 1917, page 318.]

[9] The Articles of War adopted by Congress in 1916 and amended June 4, 1920, 41 Stat 759, contained the following provision:

"ART. 62. DISRESPECT TOWARD THE PRESIDENT, VICE PRESIDENT, CONGRESS, SECRETARY OF WAR, GOVERNORS, LEGISLATURES.—Any officer who uses contemptuous or disrespectful words against the President, Vice President,

the Congress of the United States, the Secretary of War, or the governor or legislature of any State, Territory, or other possession of the United States in which he is quartered shall be dismissed from the service or suffer such other punishment as a court-martial may direct. Any other person subject to military law who so offends shall be punished as a court-martial may direct." [Act of June 4, 1920, 41 Stat 759, 801; Manual for Courts-Martial, U. S. Army, 1921, page 518.]

[10] The Elston Act, Public Law 759, 89th Congress, 62 Stat 604, 627, approved June 24, 1948.

phrase, a standard has meaning only when associated with the considerations which gave birth to the nomenclature. See Douds, 339 US at 397, 94 L ed 942, 70 S Ct 674. To those who would paralyze our Government in the face of impending threat by encasing it in a semantic straightjacket we must reply that all concepts are relative." [Chief Justice Vinson in Dennis v United States, 341 US 494, 508, 95 L ed 1137, 1152, 71 S Ct 857 (1951).]

The following is from the text in "Constitution of the United States of America," Revised and Annotated, 1963:[11]

"The Federal Government may punish utterances which obstruct its recruiting or enlistment service, *cause insubordination in the armed forces,* encourage resistance to government in the prosecution of war, or impede the production of munitions and other essential war material. The only issue which has divided the [Supreme] Court with regard to such speech has been the degree of danger which must exist before it may be punished. The decision in Dennis v United States diminishes, if it does not eliminate, this issue." [Page 895. Emphasis supplied. Cf. New York Times Co. v Sullivan, 376 US 254, 11 L ed 2d 686, 84 S Ct 710 (1964), with Annotation: Right to Free Speech, 11 L ed 2d 1116.]

In *Schenck* and *Frohwerk,* both supra, and also in Debs v United States, 249 US 211, 63 L ed 566, 39 S Ct 252 (1919), the defendants were charged with conspiracy to violate the Espionage Act of June 15, 1917, by causing and attempting to cause insubordination in the military forces and to obstruct the recruiting and enlistment service when the United States was at war with the German Empire. The proof consisted of making speeches, printing and circulating bulletins, and the printing of a newspaper. The Supreme Court, although announcing the "clear and present danger" doctrine (*Schenck*), affirmed those convictions. The proof in Schenck v United States, supra, in which the doctrine was announced and the conviction sustained, was of such a nature as to cause Chief Justice Vinson to observe in Dennis v United States, supra:

". . . The objectionable document denounced conscription and its most inciting sentence was, 'You must do your share to maintain, support and uphold the rights of the people of this country.' 249 US at 51. Fifteen thousand copies were printed and some circulated. This insubstantial gesture toward insubordination in 1917 during war was held to be a clear and present danger of bringing about the evil of military insubordination." [341 US 494, 504, 95 L ed 1137, 1150, 71 S Ct 857 (1951).]

The evil which Article 88 of the Uniform Code, supra, seeks to avoid is the impairment of discipline and the promotion of insubordination by an officer of the military service in using contemptuous words toward the Chief of State and the Commander-in-Chief of the Land and Naval Forces of the United States. Under the British Articles of War of 1765, the precursor to Article 88, Uniform Code of Military Justice, supra, was included with the offense of sedition under Section II thereof, entitled, "Mutiny." It is similarly separated in the American Articles of War 1776, being grouped with the offenses of sedition and mutiny. Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, at pages 932 and 961. We need not determine whether a state of war presently exists. We do judicially know that hundreds of thousands of members of our military forces are committed to combat in Vietnam, casualties among our forces are heavy, and thousands are being recruited, or drafted, into our armed

---

[11] Prepared by the Legislative Reference Service, Library of Congress, Edward S. Corwin, Editor of 1952 Edition, Norman J. Small, Editor, and Lester S. Jayson, Supervisory Editor of 1964 Edition, U. S. Government Printing Office, 1964.

forces. That in the present times and circumstances such conduct by an officer constitutes a clear and present danger to discipline within our armed services, under the precedents established by the Supreme Court, seems to require no argument.

The offense denounced by Article 88, supra, was an offense in the British forces at the beginning of our Revolutionary War and was readopted by the Continental Congress. It is significant that it was reenacted by the First Congress of which fifteen of the thirty-nine signers of the Constitution were members, including James Madison, the author of the Bill of Rights. United States v Culp, 14 USCMA 199, 211, 14 CMR 411. It is of even more significance that this provision was readopted by the Ninth Congress in 1806, after the Bill of Rights had been adopted and became a part of the Constitution. This action of Congress constituted a contemporary construction of the Constitution and is entitled to the greatest respect. United States v Culp, supra.

Speaking of a provision of this identical statute of 1806, the Supreme Court said in Ex parte Quirin, 317 US 1, 41, 87 L ed 3, 20, 63 S Ct 2 (1942):

". . . This enactment must be regarded as a contemporary construction of both Article 3, § 2, and the Amendments as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces. It is a construction of the Constitution which has been followed since the founding of our government, and is now continued in the 82d Article of War. Such a construction is entitled to the greatest respect."

Since our decision in United States v Culp, supra, the Supreme Court has had occasion to again consider the question of contemporary construction of the Constitution. Growing out of the dispute occasioned by the order for the integration of the University of Mississippi, Governor Ross R. Barnett was cited for contempt and demanded trial by jury. In holding

that he was not entitled to trial by jury, the Supreme Court said, in United States v Barnett, 376 US 681, 693, 12 L ed 2d 23, 32, 84 S Ct 984 (1964):

". . . Indeed, the short answer to this contention is the Judiciary Act of 1789 which provided that the courts of the United States shall have power to 'punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same.' It will be remembered that this legislation was enacted by men familiar with the new Constitution. Madison urged passage of the act in the House and five of the eight members of the Senate Committee which recommended adoption, were also delegates to the Constitutional Convention of 1787. 1 Annals of Congress 18, 812–813."

That Article 88, supra, does not violate the First Amendment is clear. This conclusion is compelled and fortified by the recent action of the Supreme Court in United States v Barnett, supra. The reenactment by the First Congress on two occasions of the previously existing Articles adopted by the Continental Congress and the action of Congress in 1806 in reenacting the substantially identical provision, now contained in Article 88, must be regarded as contemporary construction of the constitutional provisions. On no less than six occasions since the enactment of 1806, the Congress has reenacted the provision, with little or no change, as a construction of the Constitution which has been followed since the founding of our government.

In his lecture on "The Bill of Rights and the Military," given as the third James Madison Lecture at the New York University Law Center on February 1, 1962 (37 New York University Law Review 181, 183), Chief Justice Warren stated the historical fact:

"It is significant that in our own hemisphere only our neighbor, Canada, and we ourselves have avoided rule by the military through-

174

out our national existences. This is not merely happenstance. A tradition has been bred into us that the perpetuation of free government depends upon the continued supremacy of the civilian representatives of the people. To maintain this supremacy has always been a preoccupation of all three branches of our government. To strangers this might seem odd, since our country was born in war. It was the military that, under almost unbearable conditions, carried the burden of the Revolution and made possible our existence as a Nation.

"But the people of the colonies had long been subjected to the intemperance of military power. Among the grievous wrongs of which they complained in the Declaration of Independence were that the King had subordinated the civil power to the military, that he had quartered troops among them in times of peace, and that through his mercenaries he had committed other cruelties. Our War of the Revolution was, in good measure, fought as a protest against standing armies. Moreover, it was fought largely with a civilian army, the militia, and its great Commander-in-Chief was a civilian at heart. After the War, he resigned his commission and returned to civilian life. In an emotion-filled appearance before the Congress, his resignation was accepted by its President, Thomas Mifflin, who, in a brief speech, emphasized Washington's qualities of leadership and, above all, his abiding respect for civil authority. This trait was probably best epitomized when, just prior to the War's end, some of his officers urged Washington to establish a monarchy, with himself at its head. He not only turned a deaf ear to their blandishments, but his reply, called by historian Edward Channing 'possibly, the grandest single thing in his whole career,' stated that nothing had given him more painful sensations than the in-formation that such notions existed in the army, and that he thought their proposal 'big with the greatest mischiefs that can befall my country.'

"Such thoughts were uppermost in the minds of the Founding Fathers when they drafted the Constitution. Distrust of a standing army was expressed by many. Recognition of the danger from Indians and foreign nations caused them to authorize a national armed force begrudgingly."

The Chief Justice could have added that our neighbor, Canada, and the United States are the two great English-speaking countries of the Western Hemisphere. Both nations have a long tradition based upon Anglo-Saxon jurisprudence which has consistently subordinated the military to the civilian in Government. We would surely be ill-advised to make an exception for the civilian soldier which would inevitably inure to the advantage of the recalcitrant professional military man by providing an entering wedge for incipient mutiny and sedition.

True, petitioner is a reserve officer, rather than a professional officer, but during the time he serves on active duty he is, and must be, controlled by the provisions of military law. In this instance, military restrictions fall upon a reluctant "summer soldier"; but at another time, and differing circumstances, the ancient and wise provisions insuring civilian control of the military will restrict the "man on a white horse."

What has been written historically of Article 88 of the Code, supra, applies with equal force to Article 133 of the Uniform Code. This codal provision reads:

"Any commissioned officer, cadet, or midshipman who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct."

Article 47, Articles of War, enacted June 30, 1775[12]—identical to Article 23 of the British Articles of War in

---

[12] "Whatsoever commissioned officer shall be convicted before a general court-martial, of behaving in a scandalous, infamous manner, such as is unbecoming the character of an officer and a gentleman, shall be dis-

175

force at the beginning of the Revolutionary War—provided for the discharge from the service of any commissioned officer convicted by a general court-martial "of behaving in a scandalous, infamous manner, such as is unbecoming the character of an officer and a gentleman." Winthrop's Military Law and Precedents, supra, at page 957. In this same text, it is to be found as Article 21 of the Articles of War, enacted September 20, 1776, and as Article 20 of the Articles of War, enacted May 31, 1786. Winthrop, supra, at pages 969, 974. The scope of this provision was thereafter enlarged by the Articles of War, enacted April 10, 1806 (2 Stat 359), for Article 83 thereof omitted the original phrase "scandalous, infamous," providing simply, "Any commissioned officer convicted before a general court-martial of conduct unbecoming an officer and a gentleman, shall be dismissed the service." Winthrop, supra, at page 983. In the Articles of 1874 (Revised Statutes, section 1342), Article of War 61,[13] dismissal was made applicable for any conviction of an officer without regard to the trial forum, and, thereafter, of any "cadet" —by the Act of August 29, 1916, Article 95 (39 Stat 650).[14] The Act of June 4, 1920, Article 95 (41 Stat 787) brought no change. Other than including "Midshipmen" within the scope of the provision and removing the mandatory punishment of dismissal, this Article has since then remained the same. See Article 133 of the Uniform Code, supra, Act of May 5, 1950, 64 Stat 108, 142, and the Act of August 10, 1956, 70A Stat 36, 76.

Regardless, it is now argued that the charge founded upon this Article violates the First Amendment to the Constitution, fails to state an offense, and is so vague and uncertain that the due process clause of the Fifth Amendment is abridged.

That Article 133 affronts no constitutional concept has seemingly never been in doubt. In its present form, it is not a penal statute of sweeping and improper application. N.A.A.C.P. v Button, 371 US 415, 9 L ed 2d 405, 83 S Ct 328 (1963). Nor is it one "applied solely to terminate the reasonable, orderly, and limited exercise of the right to protest." Brown v Louisiana, 383 US 131, 142, 15 L ed 2d 637, 645, 86 S Ct 719 (1966). The right to free expression is not here curtailed. Indeed, in the military, it is specifically assured by AR 600–20, paragraph 46, January 31, 1967,[15] superseding, but identical to, paragraph 46.1, then applicable. In truth, Article 133 concerns only the abuse of that right. De Jonge v Oregon, 299 US 353, 81 L ed 278, 57 S Ct 255 (1937). No one can quarrel with the general proposition that "freedom of expression upon public questions is secured by the First Amendment"; that this safeguard "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people"; or "that public discussion is a political duty." New York Times Co. v Sullivan, 376 US 254, 269, 11 L ed 2d 686, 84 S Ct 710 (1964), with Annotation: Right to Free Speech, 11 L ed

charged from the service." [Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, at page 957.]

[13] "Any officer who is convicted of conduct unbecoming an officer and a gentleman shall be dismissed from the service." [Ibid., at page 991.]

[14] "Any officer or cadet who is convicted of conduct unbecoming an officer and a gentleman shall be dismissed from the service." [Act of August 29, 1916, Article 95 (39 Stat 650, 666).]

[15] "Participation in picket lines or any other public demonstrations, including those pertaining to civil

rights, may imply Army sanction of the cause for which the demonstration is conducted. Such participation by members of the Army, not sanctioned by competent authority, is prohibited—
 a. During the hours they are required to be present for duty.
 b. When they are in uniform.
 c. When they are on a military reservation.
 d. When they are in a foreign country.
 e. When their activities constitute a breach of law and order.
 f. When violence is reasonably likely to result."

2d 1116. It must, on the other hand, be noted, the "search for the outer limits of that right" (Curtis Publishing Co. v Butts, — US —, 18 L ed 2d 1094, 87 S Ct 1975, decided June 12, 1967) has, in the main, been restricted to the civilian and not to the military community and, even then, as we have said, the right is not to be exercised totally unrestricted. Dennis v United States, Schenck v United States, Curtis Publishing Co. v Butts, all supra; see, also, Annotation: Right of Free Speech, supra.

As long ago as 1886, the Supreme Court, in Smith v Whitney, 116 US 167, 186, 29 L ed 601, 607, 6 S Ct 570, recognized the worth of such a statutory limitation by refusing to order a writ of prohibition to issue when to do so "would be to declare that an officer of the Navy, who, while serving by appointment of the President as Chief of a Bureau in the Navy Department, makes contracts or payments, in violation of law, in disregard of the interests of the Government, and to promote the interests of contractors, cannot lawfully be tried by a court-martial composed of naval officers, and by them convicted of scandalous conduct, tending to the destruction of good morals and to the dishonor of the naval service." In arriving at this determination, that court first observed:

"Under the sixty-first of the Articles of War for the Government of the Army of the United States, which, omitting the words 'scandalous or infamous,' provides that 'Any officer who is convicted of conduct unbecoming an officer and a gentleman shall be dismissed from the service,' it is observed in the most recent treatise on military law, and supported by copious references to precedents: 'While the act charged will more usually have been committed in a military capacity, or have grown out of some military status or relation, it is by no means essential that this should have been its history. It may equally well have originated in some private transaction of the party (as a member of civil society, or as a man of business), which, while impeaching his personal honor, has involved such notoriety or publicity, or led to such just complaint to superior military authority, as to have seriously compromised his character and position as a officer of the Army and brought scandal or reproach upon the service.' 1 Winthrop, Military Law, 1023 *et seq.* See also 6 Ops. Attys-Gen. 413, 417; *Runkle v United States,* 19 C. Cl. 396, 414." [*Id.*, at page 185. See, also, United States v Fletcher, 148 US 84, 37 L ed 378, 13 S Ct 552 (1893), and authorities cited therein.]

Similarly, this Court wrote with regard to Article 133 of the Uniform Code, supra:

"Conduct unbecoming an officer has long been recognized as a military offense, and it is to be noted that the quoted language from the present Manual is substantially identical to the treatment given the same offense by the services under the law prior to the enactment of the Uniform Code. See Manual for Courts-Martial, U. S. Army, 1949, paragraph 182; Manual for Courts-Martial, U. S. Air Force, 1949, paragraph 182; Manual for Courts-Martial of the United States Coast Guard, 1949, article 212; Naval Courts and Boards, 1937, § 99; Manual for Courts-Martial, U. S. Army, 1928, paragraph 151; Manual for Courts-Martial, U. S. Army, 1921, paragraph 445; Manual for Courts-Martial, U. S. Army, 1917, paragraph 445. Indeed, the understanding of the nature of conduct contemplated as being unbecoming an officer and gentleman goes back even further. Thus, Colonel Winthrop, in his treatise Military Law and Precedents, 2d ed, 1920 Reprint, noted at pages 711–712:

'. . . To constitute therefore the conduct here denounced, the act which forms the basis of the charge must have a double significance and effect. Though it need not amount to a crime, it must offend so seriously against law, justice, morality or decorum

**177**

as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents.'

"From the foregoing, it is evident that the essence of an Article 133 offense is not whether an accused officer's conduct otherwise amounts to an offense—although, of course, it may—but simply whether the acts meet the standard of conduct unbecoming an officer as spelled out. Manifestly this is so for, in the face of a well-defined and long-standing interpretation extant under the precursor statutes—particularly Article of War 95—Congress substantially reenacted the prior law as Article 133 of the Uniform Code, with the single exception of the punishment prescribed. See United States v Davis, 12 USCMA 576, 580, 31 CMR 162; 2 Sutherland, Statutes and Statutory Construction, § 5109 (3d ed, Horack). The same conclusion is also supported by the rationale of our recent decision in United States v Sadinsky, 14 USCMA 563, 34 CMR 343, for, if only conduct otherwise recognized as criminal were embraced by Article 133, the enactment of that statute would be rendered wholly futile and meaningless. See United States v Sadinsky, supra, 14 USCMA at page 566.

"Clearly, then, the appropriate standard for assessing criminality under Article 133 is whether the conduct or act charged is dishonorable and compromising as hereinbefore spelled out—this notwithstanding whether or not the act otherwise amounts to a crime. And this is the standard employed by this Court in previous cases where we have had occasion to consider Article 133. See United States v Gomes, 3 USCMA 232, 11 CMR 232; United States v Daggett, 11 USCMA 681, 29 CMR 497." [United States v Giordano, 15 USCMA 163, 168, 35 CMR 135.]

In short, we, too, find Article 133 of the Uniform Code, supra, a constitutionally permissible exercise of statutory restraint.

By the same token, we find little merit to the defense argument that the instant specification does not state an Article 133 offense, in that the action or behavior proscribed must be limited to the accused's "official capacity." Suffice it to again say, an officer on active duty is not a civilian and his off-duty activities do not fall outside the orbit of Article 133, AR 600–20, paragraph 46.1, notwithstanding insofar as an abuse to the right of free expression is concerned.

This conclusion is buttressed by still another portion of Smith v Whitney, supra, where, at page 606, the Supreme Court observed:

"Under every system of military law for the government of either land or naval forces, the jurisdiction of courts-martial extends to the trial and punishment of acts of military or naval officers which tend to bring disgrace and reproach upon the service of which they are members, *whether those acts are done in the performance of military duties, or in a civil position, or in a social relation, or in private business.*" [Emphasis supplied.]

Turning to the remaining question of constitutional import, we do not consider Article 88 so vague and uncertain on its face that it violates the due process clause of the Fifth Amendment. It has been said that the constitutional requirement of definiteness is violated by a criminal statute only if that statute fails to give a person of ordinary intelligence fair notice that his contemplated conduct is denounced by the statute. United States v Harriss, 347 US 612, 98 L ed 989, 996–997, 74 S Ct 808 (1954). Moreover, the Supreme Court has held that "if the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague, even though marginal cases could be put where doubts might

arise. United States v Petrillo, 332 US 1, 7, 91 L ed 1877, 1882, 67 S Ct 1538. Cf. Jordan v DeGeorge, 341 US 223, 231, 95 L ed 886, 893, 71 S Ct 703. And if this general class of offenses can be made constitutionally definite by a reasonable construction of the statute, this Court is under a duty to give the statute that construction." *Id.*, at page 618. In this regard, "the standard as defined is not a neat, mathematical formulary. Like all verbalizations it is subject to criticism on the score of indefiniteness." Dennis v United States, supra, at page 1156. So long as there are ascertainable standards of guilt, that is enough, for impossible standards of specificity are not demanded.

". . . The test is whether the language conveys a sufficient definite warning as to the proscribed conduct when measured by common understanding and practice (United States v Cardiff, 344 US 174, 73 S Ct 189, 97 L Ed 200; Cramp v Board of Public Instruction of Orange County, Fla., 368 US 278, 82 S Ct 275, 7 L Ed 2d 285, 292; Winters v New York, 333 US 507, 68 S Ct 665, 92 L Ed 840; Champlin Refining Co. v Corporation Commission, 286 US 210, 52 S Ct 559, 76 L Ed 1062, 86 ALR 403) . . . ." [State v Hill, 189 Kan 403, 369 P2d 365, 371, 91 ALR2d 750, 760 (1962).]

Be that as it may, the Supreme Court has recently written:

". . . The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. Cf. Marcus v Search Warrant of Property, etc., 367 US 717, 733, 6 L ed 2d 1127, 1137, 81 S Ct 1708. These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the ac-tual application of sanctions. Cf. Smith v California, supra (361 US at 151–154); Speiser v Randall, 357 US 513, 526, 2 L ed 2d 1460, 1472, 78 S Ct 1332. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity. Cantwell v Connecticut, 310 US 296, 311, 84 L ed 1213, 1221, 60 S Ct 900, 128 ALR 1352." [N.A.A.C.P. v Button, 371 US 415, 433, 9 L ed 2d 405, 418, 83 S Ct 328 (1963).]

Whatever the test, Article 88 meets the constitutional norm as to certainty. We need not dwell on its susceptibility of improper application for that possibility has had previous assessment. In the matter of "fair notice," we emphasize that Article 88 is designed to cover the use of "contemptuous" words toward holders of certain offices named therein. "Contemptuous" is used in the ordinary sense as is evidenced by the Manual for Courts-Martial, United States, 1951, paragraph 167. See Webster's Third New International Dictionary. The proscribed conduct having been made certain and the warnings sufficient, it follows that the language of the Article satisfies the test of definiteness, just as does Article 133, hereinbefore discussed. See United States v Fletcher, Smith v Whitney, and United States v Giordano, all supra. In sum, we answer issues 1, 2, and 3 adversely to the petitioner.

Counsel for the appellant also contend that the law officer erred to the prejudice of Lieutenant Howe in failing to instruct, *sua sponte,* that if the court-martial found the alleged contemptuous words to have been uttered in the course of a political discussion, it thereupon had to find he intended these words to be personally disrespectful.

It is argued that this record shows accused participating in a political discussion, and that, under the circumstances, personal contempt for the President was absent—this latter aspect being an ingredient of the offense.

Assuming the conduct in question amounts to a political discussion, as appellate defense counsel ▮ contend, the argument advanced nonetheless fails. A plain and unambiguous statute is to be applied and not interpreted. United States v Davis, 12 USCMA 576, 31 CMR 162. Neither the Manual nor the Code make "intent" an element of the offense. Admittedly, paragraph 167 of the Manual, supra, provides, in part:

". . . *Adverse criticism* of one of the officials or groups named in the article, in the course of a political discussion, even though emphatically expressed, if not personally contemptuous, may not be charged as a violation of the article." [Emphasis supplied.]

The above-quoted emphasized phrase, however, cannot be equated to the contemptuous language prohibited by this Article. Indeed, paragraph 167 further provides:

". . . However, giving broad circulation to a written publication containing contemptuous words of the kind made punishable by this article, or the utterance of such contemptuous words in the presence of military inferiors, would constitute an aggravation of the offense."

Neither the legislative history of the Uniform Code nor interpretation of comparable Articles of War lend themselves to any different interpretation. See United States v Poli, CM 235607, 22 BR 151, 161 (1943). Accordingly, the law officer did not err in failing to give a *sua sponte* instruction concerning intent.

The next issue to be considered is whether appellant was substantially prejudiced by the law officer's ruling that the maximum sentence for the charged offenses included confinement at hard labor for three years. The Table of Maximum Punishments, Manual for Courts-Martial, United States, 1951, paragraph 127c, does not provide a stated punishment for either of the offenses here charged. It should be noted that for punishment purposes they were treated as multi-plicious. In those instances where punishment is not stated, if the offense is included within an offense listed in the Table of Maximum Punishments or is closely related to some other listed offense, "the lesser punishment prescribed for either the included or closely related offense will prevail as the maximum limit of punishment." Paragraph 127c, supra. Since neither of the offenses here involved is included within other offenses, it is the contention of the appellate defense counsel that they are most closely akin to the offenses under Article 89 of the Uniform Code, 10 USC § 889, for it makes punishable disrespect toward a superior officer. Six months is the maximum authorized confinement for conviction under this Article. Such was not the view taken by the law officer for he had instructed the court on a three-year maximum for confinement, treating these offenses as being similar to an Article 134 offense of uttering disloyal statements. To this, defense replies that even if the Article 134 offense is possibly related, where an offense not listed in the Table of Maximum Punishments is similar to listed offenses, a preference for the lesser of the two is manifest under paragraph 120c, Manual for Courts-Martial, United States, 1951, and by our holding in United States v Beach, 2 USCMA 172, 7 CMR 48.

For the charges and specifications in this case, it is our considered opinion that the offense of dis- ▮ loyal statements, in violation of Article 134 and punishable by a maximum of confinement at hard labor for three years, is most closely analogous to the instant charges. As the Government brief properly points out, the appellant's attack upon the President was made with specific reference to our involvement of overseas hostilities. The gravamen of the offenses charged, as well as that of the Article 134 offense of disloyal statements, are singular, as is the effect of such unlawful actions and declarations upon other members of the armed services (cf. Sanford v Callan, 148 F2d 376 (CA5th

180

Cir) (1945)). In this regard, we mention that defense at the trial level moved for dismissal of Charge III alleging that the specification thereunder drawn, as an Article 134 violation of disloyal conduct, failed to state an offense, having been preempted by Article 88, Uniform Code of Military Justice, and other specific Articles "which deal with disloyal conduct."

Accordingly, as to the instant charges and specifications, we find that the law officer gave the court-martial the correct maximum punishment imposable.

Yet another issue is that the law officer erred to the substantial prejudice of the appellant by instructing the court, in spite of the defense objection, that in determining whether the words used by Lieutenant Howe were contemptuous, the court-martial "should apply the test of how the words were understood and what they were taken to mean by the persons who saw them."

The appellant takes the position that the test applicable in this case is the same as that used in criminal prosecutions for obscenity. Related to the case at bar, the proper measurement, counsel contend, should have been "whether to the average person, applying contemporary community standards, on a national basis, the uttered words taken as a whole are contempuous of the specified public official."

Be that is it may, on this record of trial we envision no prejudice befalling the accused because ▆▆▆▆▆ ▆ of the instructions actually given in this area. The issue matters not, when as here, the language utilized by the appellant is obviously contemptuous *per se*. The language utilized on the appellant's placard is hardly susceptible to more than one interpretation. Since World War II, the word "Fascist" has been accorded public definition, just as have such words as "Communist" and "Nazi." Fascism signifies the antithesis of our own system of Government and for the public office holder imputes both malfeasance of office and the more horrendous crime of disloyalty. As stated in Derounian v Stokes, 168 F2d 305, 307 (CA10th Cir) (1948):

". . . the false charge or characterization of an American citizen of good character and reputation as a pro-Nazi or a pro-Fascist, or as being disloyal to the United States, was reasonably calculated to subject him to public hatred, odium, and contempt, and therefore constituted libel per se. Grant v Reader's Digest Association, 2 Cir., 151 F2d 733, certiorari denied 326 US 797, 66 S Ct 492, 90 L ed 485; Spanel v Pegler, 7 Cir., 160 F2d 619, 171 ALR 699; Mencher v Chesley, 297 NY 94, 75 NE2d 257." [See also United States v Poli, supra; cf. United States v Goins, 15 USCMA 175, 35 CMR 147; United States v Wolfson, CM 413411 (June 24, 1966); 33 Am Jur, Libel and Slander, §§ 53 and 57; 33 ALR2d 1196, 1207.]

In the last error assigned, it is asserted the appellant was prejudiced at the board of review level when Lieutenant Colonel Hagopian refused to disqualify himself from participating as a board of review member in review of the case. This assignment is founded on an affidavit made by military appellate defense counsel. In this document, it is asserted that Lieutenant Colonel Hagopian was at one time a member of the Defense Appellate Division and before it was known that he was going to be appointed to membership on a board of review, appellate defense counsel discussed with the colonel several cases assigned to counsel. Seeking his advice, as an experienced and senior member of the Division, appellate defense counsel had occasion to discuss with the colonel the facts and circumstances surrounding the purported offenses committed by Lieutenant Howe.

During these consultations, the colonel was shown photographs of Howe carrying a placard. His counsel gave the opinion Lieutenant Howe's conduct was not punishable under the Uniform Code of Military

181

Justice. The colonel opined to the contrary, believing such conduct constituted an Article 133 offense. In fact, he could not think of conduct more unbecoming an officer and a gentleman under present-day circumstances.

Appellate defense counsel believe that the colonel ventured his point of view without personal animosity, doing so only in reply to counsel's inquiry as to his opinion on the merits of the case.

Since Lieutenant Colonel Hagopian "did not express a personal prejudice against the appellant, possess a substantial interest in the case, and has not been of counsel or connected with any party or his attorney," the request for disqualification is not considered by defense as an "affidavit of bias or prejudice." Rather, appellant claims the colonel should have stepped aside because there "is an appearance of predisposition for one litigant over the other."

There being no controlling provision in the Uniform Code of Military Justice or in the Manual for Courts-Martial, we have, in prior instances where such allegations are made, turned to civil statutes for guidelines, particularly 28 USC §§ 47, 144, and 455. United States v Hurt, 9 USCMA 735, 27 CMR 3. Section 144, supra, is pertinent for it provides for disqualification because of "personal bias or prejudice."

Construing section 144, it has been held that if the affidavit complies with the statutory standards, "the judge has no alternative but to recuse himself, no matter how defamatory the charges may be and even if they are known to the Court to be false." Conversely, "if the statutory requirements are not satisfied, it is the duty of the judge to refuse to disqualify himself. . . . Thus, the mere filing of an affidavit of prejudice does not automatically disqualify a judge, . . . but the judge must pass upon the legal sufficiency of the facts well-pleaded." United States v Hanrahan, 248 F Supp 471, 475 (DC DC) (1965).

Thereafter, the test to be applied, accepting the affidavit at face value, is "whether these facts would fairly convince a sane and reasonable mind that the judge does, in fact, harbor the personal bias or prejudice contemplated by the statute." *Id.*, at page 475. In *Hanrahan,* that court defined prejudice with these words:

"In addition to establishing that a prejudice or bias harbored by a judge is of such a nature that it has, or may have, closed his mind to justice, the factual allegations must also show that this bias is *personal,* as opposed to *judicial,* in nature. See, e.g., Gallarelli v United States, 260 F2d 259 (1st Cir. 1958), cert. denied, 359 US 938, 79 S Ct 654, 3 L Ed 2d 638 (1959); United States v Gilboy, supra 162 F Supp at 394. It is the word 'personal' which is of great significance. See Craven v United States, 22 F2d 605, 607 (1st Cir 1927), cert. denied, 276 US 627, 48 S Ct 321, 72 L Ed 739 (1928). It characterizes an attitude towards or opinion about the affiant of extra judicial origin unrelated to his status as a party but pertaining to him as an individual. The distinction to be drawn is 'between a judicial determination derived from evidence and lengthy proceedings had before the court, and a determination not so founded upon facts brought forth in court, but based on attitudes and conceptions that have their origins in sources beyond the four corners of the courtroom.' In re Federal Facilities Realty Trust Co., supra 140 F Supp at 526. A bias or prejudice, if it may be called that, consisting merely in a state of mind based on the evidence adduced in open court is not the personal bias proscribed by the statute. See United States v Gilbert, 29 F Supp 507, 508–509 (SD Ohio 1939). 'The statute never contemplated crippling our courts by disqualifying a judge, solely on the basis of a bias (or state of mind, 255 US 42, 41 S Ct 236, 65 L Ed 481) against wrongdoers, civil or criminal, acquired from evidence presented in the course of judicial proceedings before him. Any other

182

construction would make the statute an intolerable obstruction to the efficient conduct of judicial proceedings, now none too speedy or effective.' Craven v United States, supra 22 F2d at 608." [*Id.*, at page 476. Cf. Cole v Loew's Inc., 76 F Supp 872 (SD Calif) (1948).]

In the case of Eisler v United States, 170 F2d 273 (CA DC Cir) (1948), certiorari granted, 335 US 857, 93 L ed 404, 69 S Ct 130, removed from the Supreme Court docket, 338 US 189, 93 L ed 1897, 69 S Ct 1453, it was contended that bias and prejudice were shown for this purported Communist defendant because of the judge's background as a special assistant to the Attorney General of the United States who, in his former capacity, assisted Federal Bureau of Investigation inquiries into the activities of aliens and Communists, including the appellant. In spite of this past employment and even though the judge had friends " 'violently anti-Communist,' " and though he had, in connection with his previous duties, sponsored deportation of alien Communists, the ruling of the court below was upheld regarding the pertinent affidavit in that it did not establish bias and prejudice "in the personal sense contemplated by the statute." *Id.*, at page 278. It was then written:

". . . Prejudice, to require recusation, must be personal according to the terms of the statute, and impersonal prejudice resulting from a judge's background or experience is not, in our opinion, within the purview of the statute." [*Ibid.*, at page 278.]

Appellate defense counsel, as we have heretofore pointed out, does not assert Lieutenant Colonel Hagopian was personally biased, only that there was the appearance of a predisposition of bias. It is error for one who is counsel on a case to participate thereafter as a judge, but, measured by the standards set out above, the instant affidavit does not, in our estimation, establish even a predisposition of possible harm. As we have noted, the specification in question is in fact legally sufficient. Lieutenant Colonel Hagopian was called upon to give no more than a legal evaluation of the specification. As a senior member of the Defense Appellate Division, and, therefore, acting as counsel, he set forth his views. His opinion did not change its legal sufficiency and his subsequent membership on the board of review, therefore, offers no possible prejudice to the appellant.

These are the considerations which prompted denial of the accused's petition in the first instance, and require us to deny the petition for reconsideration.

Chief Judge QUINN and Judge FERGUSON concur.