# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————————

**No. 201700172**

———————————————

**UNITED STATES**
*Appellee*

**v.**

**Chester N. McDONALD**
Information Systems Technician
Chief Petty Officer (E-7), U.S. Navy
*Appellant*

———————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

*Military Judges:*
Commander Arthur Gaston, JAGC, USN (arraignment);
Lieutenant Colonel Leon Francis, USMC (trial).

*For Appellant:* Captain Thomas Fricton, USMC.

*For Appellee:* Captain Brian Farrell, USMC;
Lieutenant Clayton McCarl, JAGC, USN.

———————————————

Decided 7 December 2018

———————————————

Before HUTCHISON, TANG, and LAWRENCE,
*Appellate Military Judges*

———————————————

**PUBLISHED OPINION OF THE COURT**

———————————————

TANG, Judge:

A military judge sitting as a general court-martial convicted the appellant, pursuant to his pleas, of a single specification of sexual assault of a child, 12 specifications of sexual abuse of a child, and a single specification of indecent visual recording in violation of Articles 120b and 120c, Uniform

Code of Military Justice (UCMJ), 10 U.S.C. §§ 920b and 920c (2012). A panel of members, including enlisted members, sentenced the appellant to 30 years' confinement, reduction to pay grade E-1, total forfeiture of all pay and allowances, and a dishonorable discharge. The convening authority approved the sentence as adjudged.

The appellant raises six assignments of error (AOEs): (1) the appellant's plea to Charge II is improvident because he did not make a visual recording of the victim's "private area" within the meaning of Article 120c, UCMJ; (2) Charge I, Specification 9 is multiplicious with Charge I, Specification 13 because the two specifications share the same factual basis;[1] (3) Charge I, Specifications 6, 7, 8, 9, and 13 constitute an unreasonable multiplication of charges (UMC); (4) the promulgating order does not accurately reflect that the military judge merged Specifications 2, 3, 4, 9, 10, and 11 of Charge I for sentencing and conditionally dismissed Specification 5; (5) the trial counsel made an improper sentencing argument;[2] and (6) the military judge abandoned his position of impartiality.

We find merit in the appellant's fourth AOE and order corrective action in our decretal paragraph. The appellant is entitled to accurate court-martial records. *United States v. Crumpley,* 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998). Following our corrective action, we find that no error materially prejudicial to the substantial rights of the appellant remains. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

### A. The appellant's misconduct and plea

The appellant met his wife, JM, in 2007 and the couple married in 2010. JM had two daughters from a previous relationship, CM being the oldest. CM was four years old when her mother began dating the appellant.

The appellant raised his stepdaughters as his own children. CM viewed the appellant as her father, and the two shared a close relationship.

---

[1] The appellant was originally charged with eighteen specifications under Charge I, alleging violations of Article 120b, UCMJ, and a sole Specification under Charge II, alleging a violation of Article 120c, UCMJ. As specifications were withdrawn, dismissed, and consolidated, the military judge renumbered them. We will refer to the numbering scheme reflected on the charge sheet at the time of the appellant's pleas.

[2] AOEs 5 and 6 were raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

In December 2014, the appellant was stationed in South Korea, serving a one-year unaccompanied tour while JM and his stepdaughters were in Hawaii. From late December 2014 to January 2015, the appellant returned to Hawaii on leave. By then, CM was 11 years old, and she celebrated her 12th birthday during his visit. It was during this holiday leave period that the appellant first sexually abused CM.

Twice during his holiday leave in Hawaii, the appellant sexually abused CM. On the first occasion, the appellant got into bed with CM, and, while lying next to her, began touching her buttocks with his hands while kissing her neck and back. This sexual abuse continued for "about a minute," until the appellant grew "ashamed," ceased, and promised to take CM shopping the next day.[3] On another occasion during this holiday leave period, the appellant went to CM's room to wake her up. While CM was lying in her bed in pajamas, the appellant began tickling and blowing on her stomach to wake her up. The appellant escalated from "tickling" to moving his hands and mouth to her "crotch area," at which point he "spread her legs," "touched and tickled her genitalia," then used his mouth to bite her vagina.[4] During both instances, the appellant was aroused. At that time, CM did not tell anyone what the appellant did to her, nor did she talk to the appellant about the two encounters.

A few months after the appellant returned to Korea, CM became suicidal. She attempted suicide by cutting herself with scissors and was hospitalized for two and a half weeks. CM stated she became suicidal because of "family issues," a lack of attention, and bullying in school, but that she had suppressed her thoughts of the sexual abuse the appellant had committed upon her, "push[ing] it so far down, [she] didn't think of it anymore."[5] Desperate for a change that would help, CM acquiesced to her family's and doctor's suggestion that she travel to Korea with the appellant to live with him through the remainder of his tour, which was set to end in July 2015.

In May 2015, CM travelled to Korea to live with the appellant in his off-base apartment. Although it was a two-bedroom apartment with two beds, the appellant required that CM sleep in his bed. CM stayed home while he worked, and the two spent time together after the appellant finished work and on the weekends.

---

[3] Record at 43. This conduct formed the basis of Charge I, Specifications 2 and 3. The military judge merged these specifications after findings.

[4] *Id.* at 51.

[5] *Id.* at 376.

The appellant stated that he was sexually attracted to CM, admitting that she "reminded [him] of a younger version of [his] wife."[6] He began to sexually abuse CM, as he had previously done in Hawaii. Because CM lived alone with him, he had a greater opportunity to abuse her more severely and with greater frequency. During his providence inquiry, the appellant described an ongoing course of conduct in which he would touch CM in bed at night many times during the two months she lived with him in Korea. He also described two discrete events with multiple distinct acts of sexual abuse.

### 1. Ongoing course of conduct

In describing the ongoing course of conduct, the appellant stated he began sexually abusing CM a few weeks after she arrived and continued to do so until they returned to Hawaii. He stated he would lay in bed with CM at night and touch her body. He touched her buttocks, thighs, breasts and rubbed his groin against her buttocks. He used his mouth to touch her breasts and vagina, "putting his mouth on her genitalia on the top of her underwear . . . as if [he] was going to bite and lick it."[7] He stated many nights were similar, but they were not exactly the same. Some nights he would touch certain parts of her body but not others.[8]

### 2. June 2015 abuse before volleyball game

Separate from the nighttime sexual abuse, the appellant described a specific afternoon in the first week of June 2015 that was distinct from the ongoing course of conduct. This unique occasion was particularly memorable to the appellant and encompassed the offenses alleged in Specifications 1, 9, 10, 11, and 12 of Charge I. This was the sole occasion on which the appellant digitally penetrated CM's vagina. The appellant was "cuddling" CM in bed one afternoon during the first week of June 2015.[9] They were in bed mid-day to rest for a volleyball game later that night. While the appellant lay with CM in a spooning position, he became aroused. He rubbed her "crotch" and breasts, placed his mouth on her breasts, and digitally penetrated CM's vagina.[10] During this same episode, the appellant admitted he had an erection

---

[6] *Id.* at 32.

[7] *Id.* at 62.

[8] The appellant asserted he only contacted CM's vagina and breasts with his mouth twice in Korea. *Id.* at 58-60.

[9] *Id.* at 76.

[10] *Id.* at 32.

4

and that he used his erect penis to touch CM's thighs and buttocks multiple times during this encounter.[11] During this episode, the appellant also exposed his bare erect penis to CM, then covered it with his shorts and grabbed and held his erect penis through his clothes in her presence.

### 3. The appellant washed CM

In the second discrete event, the appellant washed CM's body in the shower when her leg was in a brace due to a sports injury. Although CM required his assistance to undress and requested help to wash her back, the appellant became aroused when he saw her naked body and proceeded to wash her breasts, buttocks, and vagina, with a loofah sponge, in order to gratify his sexual desires. These acts formed the basis of Specification 5 of Charge I.

### 4. The appellant secretly photographed CM in her sleep

Aside from touching CM, the appellant secretly photographed CM while she was sleeping. He used his cellular phone to take photographs of CM sleeping in pajama shorts and underwear with a zoomed-in focus on her pubic region. Three photographs depict her underwear-clad genitalia through the loose opening of her pajama shorts. Others depict her underwear-clad and bare buttocks. After the appellant and CM returned to Hawaii, JM borrowed the appellant's phone to take pictures. While looking through the deleted folder to ensure she wasn't losing any desired pictures, JM discovered deleted photographs the appellant had taken of CM in her sleep. JM angrily confronted the appellant, who claimed he took the pictures as a "joke."[12] JM demanded the appellant tell CM he took the photos, and the appellant complied with this demand. After learning the appellant secretly photographed her body while she was asleep, CM became upset and immediately took a shower. The next day, once CM and JM were out of the house and away from the appellant, CM told JM the appellant sexually abused her.

---

[11] *Id.* at 71-72. The appellant clarified that the conduct that underlies Specifications 1 (digital penetration of CM's vagina) and 9 (touching CM's thighs and buttocks with his penis) of Charge I took place during the same encounter.

[12] *Id.* at 415.

**B. Pre-sentencing proceedings**

*1. Government's case*

During pre-sentencing proceedings, the government presented the testimony of four witnesses: CM, JM, the Naval Criminal Investigative Service (NCIS) investigator who interviewed the appellant—Special Agent BB, and a licensed clinical psychologist who was an expert in victim trauma—Dr. MM.

CM's testimony was emotional and powerful. She began crying as soon as she was asked about living in Korea, and she asked for a break soon after discussing that topic. She sobbed several times throughout her testimony and hyperventilated. She testified the appellant abused her nightly in Korea. CM described how she repeated her suicide attempts after disclosing the abuse to her mother. CM said she thinks about the abuse every day, has trouble sleeping and eating, remains in therapy, and has been diagnosed with post-traumatic stress disorder (PTSD), depression, and anxiety. When asked if there was "anything else" she wanted the members to know, she angrily confronted the appellant directly, eliciting an objection from trial defense counsel, which the military judge sustained.

Dr. MM did not evaluate CM, nor did she offer a specific diagnosis of CM. Rather, she detailed common short- and long-term effects of child sexual abuse. Dr. MM described the effects as "devastating," typically life-long, and encompassing many facets of life—especially when perpetrated by a trusted caregiver.[13]

In addition to testimony, the government offered Prosecution Exhibit (PE) 3, which consisted of 15 photographs the appellant took of CM, as evidence in aggravation. JM testified she recognized the photographs as the same photographs she found on the appellant's cellular phone.

*2. The appellant's case*

The appellant presented the expert testimony of Dr. RK, a clinical psychologist who related the results of an evaluation she performed on the appellant. Dr. RK testified that the appellant had excellent rehabilitative potential and presented a low risk of recidivism. The trial defense counsel also elicited testimony tending to contradict Dr. MM's testimony and supporting the proposition that not all child sex abuse victims will suffer long-term effects of abuse, and that their response is individualized.

---

[13] *Id.* at 430-34.

Following government and defense questioning of Dr. RK, the military judge asked Dr. RK questions about CM's testimony and PTSD. The military judge asked the psychologist to describe PTSD, its causes, impacts, levels of severity, course of treatment, then he asked logical follow-up questions to clarify the testimony. Dr. RK first brought up the distinction between acute and chronic PTSD. The trial defense counsel did not object and did not ask follow-up questions.

In his unsworn statement, the appellant stated, "I fully understand for the rest of my life . . . I will be a sex offender, I will be a . . . child-abuser and a child-sex offender. This is how the world will forever greet me. That will be my title."[14]

*3. Sentencing argument*

During his sentencing argument, the trial counsel used the term "child molester" to refer to the appellant. He further argued the appellant would have likely committed more serious misconduct with CM if he had not been caught and that the appellant was likely to re-offend. The trial defense counsel objected to the trial counsel's argument that the appellant was grooming CM's younger sister for sexual abuse. The military judge sustained the objection and provided a curative instruction.

## II. DISCUSSION

### A. Providency of the appellant's plea

Before accepting a guilty plea, a military judge must ensure the plea is supported by a factual basis. Article 45(a), UCMJ; *United States v. Care*, 40 C.M.R. 247 (C.M.A. 1969); RULE FOR COURTS-MARTIAL (R.C.M.) 910(e), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.). The military judge must elicit sufficient facts to satisfy every element of the offense in question, and a military judge's decision to accept a plea of guilty is reviewed for an abuse of discretion. *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008) (internal citation omitted). Questions of law arising from the guilty plea are reviewed *de novo. Id.* (citing *United States v. Pena*, 64 M.J. 259 (C.A.A.F. 2007)). A reviewing appellate court may only reject a guilty plea if there is a substantial basis in law or fact to question the plea. *Id.* (citing *United States v. Prater,* 32 M.J. 433 (C.M.A. 1991)). The military judge must

---

[14] *Id.* at 538.

reopen the providence inquiry if the evidence is inconsistent with the guilty plea. *See United States v. Lloyd,* 46 M.J. 19, 23 (C.A.A.F. 1997).

In the sole specification under Charge II, the appellant pleaded guilty to indecent visual recording, which criminalizes wrongfully and knowingly photographing the private area of another person without that person's consent and under circumstances in which that person has a reasonable expectation of privacy. Article 120c(a)(2), UCMJ.

The appellant contends that his plea is improvident because the 15 pictures in PE 3 do not depict CM's "private area" as that term is defined in the statute. Article 120c defines "private area" as the naked or underwear-clad genitalia, anus, buttocks, or female areola or nipple. Art. 120c(d)(2), UCMJ. In the 15 photographs, CM is asleep and clothed in either shorts or pajamas. In several photographs, CM's pajama shorts are pulled to the side, revealing her underwear. But because these pictures show CM wearing more than *just* underwear, the appellant argues that the evidence is inconsistent with his guilty plea and the military judge abused his discretion in failing to reopen the providence inquiry or to enter a plea of not guilty. We disagree.

The military judge properly described the elements of the offense and properly defined "private area." He then emphasized the legal distinction between underwear and shorts within the context of the definition of "private area," and repeated the definition of "private area."[15] Following this exchange, the appellant agreed he photographed CM's underwear-clad exposed crotch area.[16] The appellant told the military judge he "took several photographs" of CM "while she was asleep" with her legs open, with her crotch area exposed. He stated "[t]he photographs showed her private area, specifically her underwear and . . . pajamas, and crotch area."[17] The appellant admitted he took photographs of CM with her "legs spread open, wearing underwear."[18] The appellant also admitted he took "several" photographs of CM in this manner, on two or three different occasions.[19] He did not state an exact number of photographs that depicted CM's "private area," nor does the specification allege a specific number. Knowing his actions were wrongful, he de-

---

[15] We are not called upon to decide whether shorts, when worn as underwear, could constitute underwear within the context of the definition of "private area."

[16] *Id.* at 97.

[17] *Id.* at 95.

[18] *Id.* at 99.

[19] *Id.* at 95, 99.

leted the photographs. The appellant admitted he "reviewed the photographs in the NCIS investigation" and confirmed he took the photographs.[20]

In *United States v. Broce*, the Supreme Court characterized a guilty plea as "more than a confession which admits that the accused did various acts" but rather an "admission that he committed the crime charged against him." 488 U.S. 563, 570 (1989) (internal citations omitted). By pleading guilty, the appellant admitted the photographs he took of CM met the definition of "private area" and that his actions constituted the offense of indecent visual recording under Article 120c(a)(2), UCMJ. We find no substantial basis in law or fact to question the appellant's plea.

*1. The definition of "private area" does not require that the victim be completely naked or clad only in underwear*

The appellant argues that the term "underwear-clad" should be read as "covered in underwear and nothing else."[21] From this it follows, according to the appellant, that the statute "contemplates an individual in the nude or wearing underwear and only underwear."[22] At a minimum, the appellant argues, the statute requires a photographic recording of "an unobstructed image of the underwear-clad genitals, for instance when a picture is taken up a woman's dress without her knowledge."[23] The appellant claims that the pictures introduced by the government in aggravation do not depict CM's private area as that term is defined in the statute because CM is depicted in pajama shorts, and the pictures show only a small portion of CM's underwear. We hold, however, that the definition of "private area" is satisfied if the visual recording depicts any portion of the subject's genitalia or other listed body part covered only by underwear—even if the subject is wearing clothing in addition to underwear.

This assignment of error presents a straightforward question of statutory interpretation. "It is axiomatic that when a statute is clear and unambiguous, the plain meaning controls." *United States v. Quick*, 74 M.J. 517, 520 (N-M.

---

[20] *Id.* at 95. There was no evidence adduced that PE 3 contained all photographs that were "in the NCIS investigation" or all photographs that were recovered from the appellant's cellular phone. The only foundation for PE 3 came from JM's testimony confirming PE 3 contains the photographs she found in the deleted folder on the appellant's cellular phone.

[21] Appellant's Brief of 7 Nov 2017 at 15.

[22] *Id.*

[23] *Id.*

Ct. Crim. App. 2014). And here the statute is plain: if the photograph shows the genitalia, anus, buttocks, or female areola or nipple, in whole or in part, and the sole layer of clothing between the skin and the camera consists of the underwear, the photograph depicts the victim's "private area" within the meaning of Article 120c. The statute concerns itself not with what articles of clothing the *person* is wearing, but what, if anything, is covering the genitalia, anus, buttocks, or female areola or nipple in the photograph. Thus, we hold that even though CM was wearing pajama shorts with underwear underneath and next to her skin in the photographs, the appellant's guilty plea was provident as he photographed one of these listed body parts while it was covered only by underwear.

The appellant posits that an interpretation of the statute that includes photographs depicting subjects wearing clothing in addition to underwear could lead to "absurd results" such as criminalizing photos depicting a bra strap or "underwear visible over the top of the pants."[24] We disagree, as the definition of private area focuses on the *part of the body* depicted, and only depictions of "genitalia, anus, buttocks, or female areola or nipple" meet that definition. Art. 102c(d)(2), UCMJ. Here, we find there is ample evidence the appellant photographed both the underwear-clad genitalia, underwear-clad buttocks, and bare buttocks of CM on multiple occasions.

*2. Photographs depict CM's underwear-clad genitalia, underwear-clad buttocks, and bare buttocks*

The Attorney's Dictionary of Medicine defines genitalia as "[t]he genital or reproductive organs, especially the external organs as distinguished from those inside the body," and specifically lists the female genitalia as including "the mons veneris, clitoris, vagina, the labia majora and minora, etc."[25]

In PE 3, the government submitted 15 color photographs the appellant took of CM while she was sleeping. Photographs 2, 3, and 7 focus on CM's crotch area, wherein her pajama shorts are pulled to the side, revealing her underwear covering a portion of her labia majora. Because the photographs depict portions of CM's genitalia, clad only by underwear, they depict CM's "private area."

---

[24] *Id.* at 15.

[25] *Genitalia,* J.E. SCHMIDT, M.D., ATTORNEY'S DICTIONARY OF MEDICINE AND WORD FINDER (Release No. 52 Sep. 2018).

Even if the definition of "private area" were limited in the manner the appellant claims, the appellant also took photographs of CM's underwear-clad and bare buttocks. *See* PE 3 at 1, 5, 9, and 10.

*3. Even if some photos within PE 3 do not depict CM's "private area," the government's evidence in aggravation is not inconsistent with the appellant's plea*

Although some photographs in PE 3 do not depict CM's "private areas," this does not constitute an inconsistency with the appellant's guilty plea.[26] To the extent the remaining photos in PE 3 do not depict CM's "private areas," they were admitted without defense objection and constitute permissible evidence in aggravation. No evidence in the record establishes the 15 photographs in PE 3 are the *only* photographs the appellant took of CM. The appellant, represented by competent trial defense counsel, after being read the definition of the term "private area," freely admitted he photographed CM's private area and committed the offense of indecent visual recording. We find no reason to question the providence of the appellant's plea and find no evidence the military judge abused his discretion in accepting the appellant's plea.

## B. Multiplicity

The appellant alleges Specifications 9 and 13 of Charge I are multiplicious because "both address identical criminal conduct."[27]

Specification 9 alleges the appellant committed a single lewd act upon CM by touching her *thigh* and *buttocks* with his *penis*.[28] Specification 13 alleges the appellant committed lewd acts upon CM on divers occasions by rubbing his *groin* against her *buttocks*.[29] Both Specifications 9 and 13 allege the misconduct occurred in South Korea between on or about June 2015 and on or about July 2015.

The appellant entered an unconditional plea of guilty to both specifications and did not raise this objection at trial.[30] Nevertheless, the appellant is

---

[26] *See* PE 3 at 14 and 15. These photographs were taken by the appellant while lying in bed next to CM.

[27] Appellant's Brief at 20.

[28] Charge Sheet (Emphasis added).

[29] *Id.* (Emphasis added).

[30] Though the military judge and counsel discussed issues of unreasonable multiplication of charges relating to various specifications, trial defense counsel never objected to any specifications based on multiplicity.

entitled to a review for plain error in spite of the failure to object because "concerns about multiple convictions and punishments at a single trial stem from the Double Jeopardy Clause of the Fifth Amendment and, therefore, are constitutional in nature." *Lloyd*, 46 M.J. at 22. An unconditional guilty plea "waives a multiplicity issue unless the offenses are 'facially duplicative,'" which means "factually the same." *Id.* at 23; *United States v. Campbell*, 68 M.J. 217, 219-20 (C.A.A.F. 2009). Offenses are not facially duplicative "if each requires proof of a fact which the other does not." *United States v. Pauling*, 60 M.J. 91, 94-95 (C.A.A.F. 2004) (internal quotation marks and citations omitted). We conduct "a realistic comparison of the two offenses to determine whether one is rationally derivative of the other," looking to the specification as drafted and the military judge's providence inquiry. *Id.* (internal citation omitted). Whether specifications are facially duplicative is a question of law reviewed *de novo. Id.*

In conducting this "realistic comparison," we conclude the specifications are not facially duplicative because the acts are different and occurred on different days. *Id.* For Specification 9, the government had to prove the appellant's *penis* touched CM on her thigh and buttocks. For Specification 13, the government had to prove his *groin* contacted her buttocks.

The appellant claims "groin" and "penis" are synonyms.[31] We disagree. The Attorney's Dictionary of Medicine defines "groin" as "[t]he groove, and the part of the body around it, formed by the junction of the thigh with the abdomen, on either side."[32] That same dictionary defines "genitalia" as "[t]he reproductive organs, especially the external organs as distinguished from those inside the body."[33] For male genitalia, the dictionary lists "the penis, the scrotum, and the testicles."[34] It is possible for the appellant to touch CM with his genitalia—including his penis—but not his groin, and vice versa.

There is a distinction between rubbing one's penis onto a child and rubbing one's groin area onto a child. The distinction is one of common sense, which is also grounded in Article 120, UCMJ. In the Article 120(g)(2)(A), UCMJ, definition of "sexual contact," Congress distinguished between the groin and genitalia by listing them separately. "The term 'sexual contact' means . . . touching . . . the genitalia, . . . groin . . . of any person" with the

---

[31] Appellant's Brief at 22.

[32] *Groin,* J.E. SCHMIDT, M.D., ATTORNEY'S DICTIONARY OF MEDICINE AND WORD FINDER (Release No. 52 Sep. 2018).

[33] *Genitalia,* ATTORNEY'S DICTIONARY OF MEDICINE AND WORD FINDER.

[34] *Id.*

requisite intent." *Id.* Additionally, while Article 120c, UCMJ, criminalizes the intentional exposure, in an indecent manner, of the genitalia, it does not criminalize the exposure of the groin.

In sum, there is a factual distinction between the acts supporting Specifications 9 and 13, and there is a legal distinction between contact with genitalia and the groin. The appellant described Specification 9 as occurring on a different occasion than the acts that support Specification 13. During the providence inquiry for Specification 13, the appellant stated he rubbed his groin against CM's buttocks on multiple occasions that were different from the occasions he previously described in the military judge's inquiry about Specifications 1-12 of Charge I.[35] No single act was punished twice and therefore the appellant's argument is without merit.

## C. Unreasonable multiplication of charges

The appellant avers Specifications 6, 7, 8, 9, and 13 of Charge I constitute an unreasonable multiplication of charges (UMC) because they all allege lewd acts committed upon CM by the appellant in his bed in South Korea, during the two-month time period from about June 2015 to about July 2015. The specifications allege the following acts:

6: Touching CM's breasts with the appellant's hands and mouth on divers occasions;

7: Touching CM's genitalia with the appellant's hands and mouth on divers occasions;

8: Touching CM's buttocks with the appellant's hands on divers occasions;

9: Touching CM's thigh and buttocks with the appellant's penis; and

13: Rubbing the appellant's groin against CM's buttocks on divers occasions.

After the providence inquiry, but before informing the appellant of the maximum punishment, the military judge *sua sponte* addressed the issue of UMC. Trial defense counsel requested merger of Specifications 5, 6, 7, and 8; merger of Specification 2 and 3; and merger of Specifications 1, 9, 10, 11, and 12. The military judge merged Specifications 2 and 3 into a single new specification and also conditionally dismissed Specification 5 without prejudice, pending appellate review. Because the trial counsel objected to further mer-

---

[35] *See* Record at 90.

ger of specifications, the military judge deferred further UMC analysis until after presentencing proceedings.

Following the admission of presentencing evidence, the military judge re-addressed the issue of maximum punishment and UMC. Although the trial defense counsel previously objected that Specifications 6, 7, and 8 constituted UMC, he explicitly waived this objection after presentencing evidence was admitted.[36] The trial defense counsel maintained his objection to Specifications 9, 10, 11, and 12. The military judge merged Specification 10 into Specifications 7 and 8, and merged Specifications 11 and 12 into Specification 1. The appellant never objected to UMC as relates to Specification 13.

As a function of our mandate under Article 66, UCMJ, and because some UMC objections were preserved, we will evaluate whether the challenged specifications constitute UMC.

### 1. The legal standard

In *United States v. Campbell,* the Court of Appeals for the Armed Forces (CAAF) clarified the doctrines of multiplicity and unreasonable multiplication of charges. 71 M.J. 19 (2012). The CAAF reaffirmed the test outlined in *United States v. Quiroz*, 55 M.J. 334 (C.A.A.F. 2001), for evaluating an unreasonable multiplication of charges.

The *Quiroz* factors are:

> (1) Did the accused object at trial that there was an unreasonable multiplication of charges and/or specifications?

> (2) Is each charge and specification aimed at distinctly separate criminal acts?

> (3) Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?

> (4) Does the number of charges and specifications unreasonably increase the appellant's punitive exposure?

> (5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

---

[36] We find this is an intentional relinquishment of a known right, which constitutes waiver vice forfeiture, as it relates to the merger of Specifications 6, 7, and 8. *See United States v. Hardy,* 77 M.J. 438, 439 (C.A.A.F. 2018) (holding an unconditional guilty plea waives an unpreserved UMC objection). However, this waiver does not extend to review of Specifications 6, 7, and 8 as constituting UMC in relation to other specifications for which the objection was preserved.

*Campbell*, 71 M.J. at 24 (citing *Quiroz*, 55 M.J. at 338) (listing *Quiroz* factor 1 in footnote 10).

### 2. Application of Quiroz factors

The appellant argued that Specification 9 constituted UMC and should be merged with Specifications 1, 10, 11, and 12. The appellant did not request Specification 13 be merged with any other specification, and the appellant affirmatively waived merging Specifications 6, 7, and 8 for sentencing. *Quiroz* factor one weighs against the appellant.

Likewise, factor two weighs against the appellant. Each specification is aimed at "distinctly separate" criminal acts. As we noted above, Specification 9, alleging the appellant touched CM's thighs and buttocks with his penis on a single occasion in the afternoon, was distinct from Specification 13, which alleged that the appellant rubbed his groin against CM's buttocks on divers occasions while they slept in his bed at night. Likewise, Specifications 6, 7, and 8 are distinct from each other and from Specifications 9 and 13 because they each allege a different contact with CM's body by various parts of the appellant's body, often on different days during the charged period.

The remaining *Quiroz* factors also weigh against the appellant. The number of charges and specifications does not misrepresent or exaggerate the appellant's criminality. Specifications 6, 7, 8, and 13 pertain to the ongoing course of conduct and charge the various types of contact, committed repeatedly over the course of two months. Specifications 1, 9, 10, 11, and 12 pertain to a discrete instance of multiple sexual contacts the appellant committed in June 2015 in the afternoon before a volleyball game. Because the military judge merged Specifications 10, 11, and 12, this court need only analyze Specifications 1 and 9.

In the specifications alleging the ongoing course of conduct—Specifications 6, 7, 8, and 13—the government charged the appellant based upon the manner in which the appellant touched the victim. For instance, Specification 6 alleged the appellant touched CM's breasts with his hands *and* mouth.[37] The government could have, but did not, allege two separate specifications, one for contact with his hands and one for contact with his mouth. The government likewise refrained from charging one specification alleging multiple

---

[37] Although Specifications 8 and 13 both allege contact with CM's buttocks, we find the nature of contact by the appellant's hands and groin is sufficiently distinct as to not constitute UMC.

15

lewd acts per night of abuse.[38] In *United States v. Campbell,* the CAAF analyzed a charging scheme in which the government charged Captain Campbell with 3 ongoing courses of conduct vice 31 individual specifications alleging a single act of larceny for wrongfully withdrawing prescription medications from an automated dispensing machine. 71 M.J. at 25. The CAAF held that the government "arguably" *reduced* rather than exaggerated Captain Campbell's criminality when it levied 3 charges instead of 31. *Id.* We find this same logic applies to the government's charging scheme here.

The number of specifications does not constitute a "piling on" of charges, but properly "reflects charges for distinct criminal conduct." *United States v. Paxton,* 64 M.J. 484, 491 (C.A.A.F. 2007) (rejecting the appellant's UMC challenge to separate charges for the indecent acts that preceded the child rape and sodomy, all of which occurred on the same occasion). Considering Specification 9 in relation to Specification 1, it is not an unreasonable increase in the appellant's punitive exposure to face additional confinement time for a sexual contact that occurred close in time to his digital penetration of CM's vagina. The appellant cites *United States v. Thomas* in his brief. 74 M.J. 563 (N-M. Ct. Crim. App. 2014). In *Thomas,* this court held the military judge abused his discretion by declining to merge two sexual assault convictions arising from the same sexual act—one alleging the victim was asleep or otherwise unaware of the sexual act, and the other alleging the appellant knew or should have known the victim was incapable of consenting due to impairment. *Thomas* is distinguishable as the specifications in *Thomas* charged the same sexual act under two theories of liability under Article 120, UCMJ. Here, the specifications relate to two separate sexual assaults committed close in time.

Nor was it improper for the government to charge discrete assaults in conjunction with an ongoing course of conduct. Specification 9 alleges a specific sexual contact on one discrete occasion, whereas specification 13 alleges distinctly different contacts on multiple occasions. *See United States v. Rodriguez,* 2017 CCA LEXIS 42 at *35 (N-M. Ct. Crim. App. 30 Jan 2017) (unpub. op.) (holding it was not an unreasonable multiplication of charges to punish appellant for an ongoing course of conduct in addition to two discrete assaults). It was not unreasonable to charge and punish the appellant for both offenses under Specifications 9 and 13. There is no prosecutorial overreach. These different offenses could not have been charged as one as they

---

[38] We do not encourage this practice, but assesses the government's reasonableness in light of the different charging possibilities.

involve different acts. The same analysis applies to Specification 9 in relation to Specifications 6, 7, and 8.

All told, the specifications do not misrepresent the appellant's criminality, unreasonably increase his punitive exposure, and there is no evidence of prosecutorial overreach. Specifications 6, 7, 8, 9, and 13 do not constitute UMC and it was appropriate to allow sentencing on all specifications.

**D. Improper argument**

The appellant argues the trial counsel made improper arguments when he: (1) argued facts that were not in evidence; (2) argued the members should disregard the accused's service record as a mitigating factor; and (3) repeatedly referred to the appellant as a "child molester." The trial defense counsel's only objection related to arguing facts not in evidence. The trial defense counsel did not object to the other arguments the appellant now claims were improper.

In *United States v. Andrews*, the CAAF outlined the standard of review for alleged prosecutorial misconduct in the form of improper argument: "We review prosecutorial misconduct and improper argument de novo. If proper objection is made, we review for prejudicial error. If no objection is made, we . . . review for plain error. The burden of proof under plain error review is on the appellant." 77 M.J. 393, 398 (C.A.A.F. 2018) (internal citations omitted). Plain error is error that is "plain or obvious" and which "results in material prejudice to a substantial right of the accused." *Id.* at 401 (internal citation omitted). Whether or not counsel objected, the appellant is only entitled to relief when error is prejudicial—in this context, "the trial counsel's comments" when "taken as a whole" must be "so damaging that we cannot be confident" that the members acted "on the basis of the evidence alone." *Id.* at 401-02 (citing *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017); *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014)). For the alleged improper argument not objected to at trial, the burden is on the appellant to establish prejudice. *Sewell,* 76 M.J. at 18 (internal citation omitted).

*1. Facts not in evidence*

At trial, the appellant objected to the trial counsel's argument that the appellant was "starting to groom" his other step-daughter, CM's younger sister.[39] The military judge issued a curative instruction, informing the members "there has been no evidence presented as to that whatsoever," and "no

---

[39] Record at 597.

evidence upon which to draw any reasonable inference whatsoever" that the appellant was trying to groom CM's younger sister for sexual abuse.[40] All members confirmed they would completely disregard that portion of trial counsel's argument. Members are "presumed to follow the military judge's instructions." *United States v. Loving*, 41 M.J. 213, 235 (C.A.A.F. 1994) (quoting *United States v. Holt*, 33 M.J. 400, 408 (C.M.A. 1991)). Upon consideration of the military judge's strongly worded curative instruction and the member's affirmation that they would follow the instruction, we find no error prejudicial to the substantial rights of the appellant.

The appellant additionally avers, for the first time on appeal, that trial counsel improperly argued facts not in evidence when he argued: (1) the appellant would recidivate, despite Dr. RK's testimony that the appellant presented a low risk of recidivism; and (2) the appellant's sexual abuse caused CM's first suicide attempt in Hawaii. Absent objection at trial, we review for plain error and find none.

The appellant cites to *United States v. Fre*y, 73 M.J. 245 (C.A.A.F. 2014) to claim it was improper for trial counsel to argue the appellant would recidivate.[41] We find *Frey* to be distinguishable from this case. In *Frey*, without any expert testimony or other evidence on the risk of recidivism, trial counsel appealed to the members' "common sense, ways of the world, about child molesters" to argue the appellant likely offended before and would reoffend. *Frey*, 73 M.J. at 249. By contrast, in this case, the trial counsel used specific facts from the appellant's two NCIS interviews, which were admitted in evidence in presentencing, to argue that the members should lend less credibility to Dr. RK's testimony about the appellant's low risk of recidivism. The trial counsel also questioned Dr. RK's reliance upon the abilities of the probation system to ensure, based on a "monthly check-in," that the appellant would most likely "never be around children again."[42] *Frey* does not stand for the proposition that counsel cannot properly challenge the credibility of expert testimony on the risk of recidivism, but rather that trial counsel must refrain from manufacturing a risk of recidivism from thin air based on reliance on "common sense, ways of the world." *Id*. In this case, the trial counsel made proper argument.

The appellant's third argument that the trial counsel improperly argued facts outside the record challenges trial counsel's argument that the appel-

---

[40] *Id*. at 599.

[41] Appellant's Brief at 44.

[42] Record at 519.

lant's abuse caused CM's first suicide attempt.[43] Counsel may argue "all reasonable inferences fairly derived" from the evidence. *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (internal citation omitted). We do not attempt to understand the motivations behind a 12-year-old sex assault victim's first suicide attempt. However, we cannot ignore the timing of CM's first suicide attempt—just a few short months after the appellant first abused her. CM testified her suicide attempt was motivated in part by "a lot of other family issues."[44] Although she stated she repressed thoughts of her recent sexual abuse, "push[ing] it so far down, [she] didn't think of it anymore," it was a fair inference for trial counsel to argue CM's efforts to repress the abuse were not entirely successful and that the appellant's abuse was at least a contributing factor in her first suicide attempt.[45]

### 2. Accused's service record

The appellant alleges the trial counsel "argued that the members shouldn't consider [the appellant's] military background and achievements."[46] The trial counsel argued, "when weighed against being a child molester, being a good Sailor is completely and utterly irrelevant" and "when sentencing a repeat child molester, evals are meaningless."[47]

We assess these two statements in turn. Relevance is a legal term defined under Military Rule of Evidence 401. MILITARY RULE OF EVIDENCE 401, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.). The appellant's service record was not only *relevant*, it was admissible under R.C.M. 1001(c), and substantial portions of the appellant's service record were *admitted* into evidence. The members were required to consider all admitted evidence. Because the trial counsel's argument misused the legal term of relevance, this argument misstated the law and was improper. In the absence of objection, we find the trial counsel's argument that "being a good Sailor is completely and utterly irrelevant" constituted obvious error.

Turning to the second argument, that the appellant's "evals [were] meaningless," we reach a different result. This argument did not misuse a legal term. We evaluate counsel's argument in "context" and do not focus our in-

---

[43] Appellant's Brief at 46.

[44] Record at 376.

[45] *Id.*

[46] Appellant's Brief at 46.

[47] Record at 583-84.

quiry "on words in isolation." *Baer,* 53 M.J. at 238 (internal citation omitted). Viewing the trial counsel's argument in context, we find the trial counsel did not urge the members to completely disregard admissible evidence, but rather to give it the weight it merits—almost no weight—when balanced against the severity of the appellant's offenses. This is proper argument.

Having found plain error in one aspect of the trial counsel's argument, we must assess for prejudice. The appellant is entitled to relief based on improper argument only if the argument "materially prejudiced" his "substantial rights." *Baer,* 53 M.J. at 237 (internal citation omitted). The military judge properly instructed the members to consider all evidence in aggravation, extenuation, and mitigation, and he instructed the members on the defense-provided *Wheeler* factors which described the appellant's military service.[48] The members had no questions about this instruction. Absent contrary indications, we presume the panel followed the military judge's instructions. *United States v. Sewell*, 76 M.J. at 19. Even though the trial counsel made one improper argument, it was a single statement, which turned on the improper use of one word, over the course of a 17-page argument. Viewed as a whole, the trial counsel's argument urged the members to "fashion their sentence" based upon "cool, calm consideration of the evidence and commonly accepted principles of sentencing," focusing on the severity and frequency of the appellant's offenses and their impact on CM. *Baer,* 53 M.J. at 237 (internal quotations and citation omitted). We find no material prejudice to the appellant's substantial rights.

*3. "Child molester"*

Finally, the appellant complains the trial counsel improperly used the words "molest" and "child molester" during his sentencing argument. The appellant pleaded guilty to specifications involving sexual assault of a child and sexual abuse of a child, by committing lewd acts. We find the word "molest" to be synonymous with the word "abuse" when used in the context of child sexual abuse and we do not find error in the trial counsel's use of the word "molest" in this case.

The trial counsel used the term "child molester" to refer to the appellant, either directly or by implication, 14 times in 17 pages of argument. Based on the appellant's guilty pleas, the trial counsel could fairly call the appellant an admitted "child sexual abuser" or a person convicted of "sexually assaulting a child," or similar terms. It was the appellant—not the trial counsel—who first

---

[48] *Id.* at 566, 573-75; *United States v. Wheeler,* 17 U.S.C.M.A. 174 (C.M.A. 1967).

referenced the words by which society would address him. During his unsworn statement, the appellant stated he will be forever branded with the titles "child-abuser," "sex offender," and "child sex-offender."[49]

Used in this context, in light of the trial counsel's complete sentencing argument, we find that the trial counsel did not overuse the word "child molester" and did not "unduly . . . inflame the passions or prejudices of the court members." *United States v. Schroder,* 65 M.J. 49, 58 (internal citation omitted). Assessing for plain error, we find none.

### 4. Confidence in the sentence

When improper argument occurs in sentencing, the court must evaluate whether we can be "confident that [the appellant] was sentenced on the basis of the evidence alone." *United States v. Halpin,* 71 M.J. 477, 480 (C.A.A.F. 2013) (brackets in original) (internal citation omitted). We find the trial counsel made an improper argument when he characterized the appellant's service record as "completely and utterly irrelevant." We find the other arguments cited by the appellant were not improper. Assuming *arguendo,* the additional complained of arguments constituted error, we find the appellant was not prejudiced by any errors in the sentencing argument.

The military judge instructed the members they could sentence the appellant to up to 170 years' confinement, and the trial counsel urged the members to impose that maximum confinement sentence. The members awarded 30 years' confinement. We do not find the members sentenced the appellant based on improper argument, nor do we find that they failed to fairly consider the appellant's military career.

The appellant's crimes justify a sentence of 30 years' confinement. Based on the nature of the appellant's position as a trusted parental figure, the ongoing course of conduct, and the impact of appellant's crimes on his victim, the evidence amply supports a sentence including 30 years' confinement.

## E. Military judge's impartiality

In his final AOE, the appellant argues that the military judge abandoned his impartial role when he asked a defense witness about the effects of "chronic PTSD."[50] The appellant's challenge to the military judge's impartiality is without merit. The trial defense counsel elicited testimony from the defense expert, Dr. RK, on direct examination about the long-term effects of

---

[49] Record at 538.

[50] Appellant's Brief at 10.

child sexual abuse, suggesting not all victims suffer life-long harm. When the trial defense counsel sought to further question Dr. RK on the potential harm resulting from the child victim being call to provide testimony at trial, the trial counsel objected. During an Article 39(a) session, the trial defense counsel argued the evidence was relevant to show that some of CM's trauma, evident in her emotional testimony, was caused by re-victimization through the trial process, not by the appellant. The military judge ruled in the appellant's favor, permitting the line of questioning. After cross-examination, the military judge asked follow-up questions about PTSD. His questions were within the scope of trial defense counsel's examination, which included testimony about potential life-long impact on child victims of sexual abuse. To guard against any perceived lack of partiality on his part, the military judge instructed the members that they were to "disregard any comment or statement or expression made by [him] during the course of the trial that might seem to indicate any opinion on [his] part."[51]

### III. CONCLUSION

The findings and the sentence are affirmed. The supplemental court-martial order shall reflect that the military judge consolidated Specifications 2 and 3 of Charge I into a new consolidated Specification 2, which reads:

> In that Information Systems Technology Chief Petty Officer Chester N. McDonald, U.S. Navy, Navy Region Hawaii, on active duty, did, on the island of Oahu, Hawaii, between on or about December 2014 and on or about January 2015, commit a lewd act upon CM, a child who had not attained the age of sixteen (16) years, to wit: touching her buttocks with his hand and kissing her neck and back with his mouth.[52]

The supplemental court-martial order shall further reflect that: the military judge conditionally dismissed Specification 5 of Charge I without prejudice, to ripen into prejudice upon completion of appellate review; merged

---

[51] Record at 545-46; 566.

[52] *Id.* at 112. The military judge used the term "merger" but his action in combining the operative language of the specifications *for findings* is more appropriately a consolidation of the specifications. *See United States v. Thomas*, 74 M.J. at 569 ("Consolidation is accomplished by simply combining the operative language from each specification into a single specification that adequately reflects each conviction.").

Specifications 7, 8, and 10 of Charge I for sentencing; and merged Specifications 1, 11 and 12 of Charge I for sentencing.

Senior Judge HUTCHISON and Judge LAWRENCE concur.

FOR THE COURT

RODGER A. DREW, JR.
Clerk of Court